UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION


DARYL MCMASTERS                                                    PLAINTIFF


vs                                              CIVIL ACTION NO. 3:14CV-329-CRS


HENDRICKSON USA, LLC d/b/a
HENDRICKSON TRUCK COMMERCIAL
VEHICLE SYSTEMS                                                    DEFENDANT


### MEMORANDUM OPINION

This matter is before the court on cross-motions for summary judgment.  In this action, the

plaintiff, Daryl McMasters, claims that Hendrickson terminated his employment in retaliation for

his exercise of his rights under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2615.

Additionally, he claims that Hendrickson retaliated against him again by filing counterclaims

against him in this action.   First Amended Complaint ("FAC")(DN 35).   The defendant,

Hendrickson USA, LLC d/b/a Hendrickson Truck Commercial Vehicle Systems ("Hendrickson"),

has moved for summary judgment on both of McMasters' claims. (DN 52).   McMasters, along

with his wife and counterclaim defendant, Molly McMasters, have filed a cross-motion for

summary judgment seeking dismissal of Hendrickson's counterclaims against them (DN 55).

Hendrickson asserts seven counts against Daryl McMasters claiming violations of the

Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.* (Count I), violation of the Federal

Stored Wire and Electronic Communications and Transactional Records Access Act, 18 U.S.C. §§

2701(a)(1)-(2)(Count II), violation of KRS 434.845 for wrongful accessing of computer systems,

software, or data (Count III), breach of the duty of loyalty (Count V), breach of fiduciary duties

(Count VI), trespass to chattels (Count VII), and violation of the federal Wiretap Act, 18 U.S.C. § 2511 (Count VIII).  Hendrickson asserts two counts against both Daryl and Molly McMasters for misuse of computer information in violation of KRS 434.855 (Count IV), and civil conspiracy (Count IX)(DN 37).

Hendrickson manufactures heavy duty truck axles and suspension systems at its plant in Lebanon, Kentucky.  This action arose from a series of events that occurred during and after McMasters' employment as Network Administrator and later Plant Programmer/Network Administrator for the Lebanon plant.

From 2002 until Hendrickson hired him in-house as its Network Administrator, McMasters performed computer programming work for Hendrickson as an outside consultant through M & M Programming, Inc. ("M & M").  Daryl McMasters Deposition ("DM Dep."), pp. 14-15.  M & M was a computer programming services company that McMasters operated with his wife and co-owner, Molly McMasters.  DM Dep., pp. 9-10.  On August 1, 2007, Hendrickson brought McMasters in-house as Network Administrator. DM Dep., pp. 14-15.  He was responsible for all computer-related activities, including programming, infrastructure design and maintenance, training, audit compliance, computer-related capital expenditures, and general hardware and software needs. Daryl McMasters Declaration ("DM Dec."), ¶ 4.  McMasters' title changed in 2008 to Plant Programmer/Network Administrator with essentially the same duties, but with an increased emphasis on programming.  DM Dep., p. 18.  McMasters worked in this position until his termination in 2014. DM Dep., p. 19.

At issue in this case is certain "L-O-T traceability" software acquired by Hendrickson from software developer Cimulus, Inc.[1]  This software was designed to trace vehicle components through

_____

[1] Hendrickson refers to this software at times  as "DataMaster."  McMasters contends that the name "DataMaster" refers to an altered and enhanced version of the L-O-T traceability software written and named by him.  The name is

the manufacturing and vehicle assembly process. DM Dep., p. 41.   The data gathered by this program would enable a company to trace each subcomponent of a vehicle back to the manufacturer in the event of a product recall.   *Id.*   Dennis Carmichael, President and General Manager of Cimulus, Inc., has averred by affidavit ("Carmichael Aff.") that Cimulus designed and developed L-O-T traceability software for Hendrickson. Carmichael Aff., ¶¶ 3-4.   Cimulus sold modules, templates, source code and other software components under a perpetual, royalty-free license with the right to modify and otherwise use these items, but Hendrickson was (1) prohibited from copying the source code or software, in whole or in part, for use in projects other than Hendrickson's own projects, (2) prohibited from removing or editing comments in the source code which identified the origin of the source code or identified Cimulus as the owner of the software, (3) prohibited from providing or reselling the source code, in compiled or uncompiled form, to any third-party without Cimulus' prior written consent, and (4) prohibited from creating or using unauthorized copies of the source code or executables.  Carmichael Aff., ¶ 4.[2]  McMasters testified that he believed that Hendrickson owned the software, but he did not know the terms of that ownership. DM Dep., p. 49.   He did not know if Hendrickson had a license agreement with Cimulus. *Id.*

It is undisputed that in 2002 Cimulus provided Hendrickson a computer disk ("CD") containing a copy of Cimulus' source code for the Hendrickson L-O-T traceability program which McMasters took from the premises of Hendrickson to enhance and develop the then-existing system in order to meet Hendrickson's changing needs. DM Dep., pp. 55, 131.  McMasters was not an employee of Hendrickson in 2002 when he received the disk nor when he began modifying

---

not of significance in this analysis. We refer in this opinion to the Cimulus source code disk which was ultimately developed and enhanced to become the 'DataMaster' system in place at the Lebanon plant by 2008.

[2] McMasters notes that Hendrickson has not produced a written license agreement.  However, he has not controverted the statements of Carmichael concerning the terms of the sale to Hendrickson.

and/or developing the code for Hendrickson and other M & M clients. He worked as a consultant with M & M until 2007.

While apparently there was no concern about McMasters' removal of the CD from the Hendrickson premises in 2002, it became a concern for Hendrickson years later in 2013 when it was recommended by Halock Security Labs, an independent auditor of security systems, that Hendrickson verify its ownership rights in all of its systems and maintain all of its source code in a single, central location. Szczepanski Dep., p. 97. Hendrickson notified McMasters by written memorandum (the "memo") on October 24, 2013 of its requirements that Hendrickson programming work be performed only on Hendrickson PCs and servers, and that all source code be maintained on Hendrickson's servers or devices. DN 62-1.[3] McMasters was required to acknowledge and accept these terms by signing a copy of the memo.

Four days after signing the memo, Molly McMasters sent Hendrickson a license agreement prepared by her, with the assistance of Daryl McMasters, purporting to grant Hendrickson a fee-free license in any code in the possession of Hendrickson which was then owned by Molly McMasters[4] in exchange for Hendrickson's agreement that any possible conflict of interest involving Molly and Daryl and Hendrickson was thus resolved by the execution of the agreement. DM Depo., p. 120, DN 56-8. The request that Hendrickson execute this agreement caused

---

[3] McMasters was required to sign the memo and a copy was placed in his personnel file. A third expectation mentioned in the memo was that McMasters was to refrain from carbon copying anyone on company emails that were not associated with Hendrickson's business. McMasters testified that he viewed this as a reprimand, despite being told that it was meant only to clarify Hendrickson policy going forward. The memo was presented to McMasters ten days after his return from a five-day FMLA leave. However, the memo is *not* mentioned in the First Amended Complaint, and *there is no allegation* that this was an adverse employment action resulting after his October 2013 FMLA leave. DN 35. Further, McMasters has not controverted Hendrickson's evidence that Halock's security audit in third or fourth quarter 2013 resulted in changes in Hendrickson's policies concerning its IT management, and impacted the way in which McMasters was expected to perform his work. He also does not dispute that he copied Molly on company emails, but maintains that he sent her only those internal emails which related to his work schedule. McMasters does not dispute that Molly was not associated with Hendrickson's business.

[4] M & M was no longer in existence at the time the license agreement was drafted. McMasters believed that his wife became the owner of any property of their company at the time of M & M's dissolution, including some code. DM Dep., p. 126.

4

Hendrickson to become concerned that it did not know what it owned, and that Molly McMasters was claiming ownership of some of the code housed on Hendrickson's servers.  DM Depo., p. 134.

The presentation of the license agreement engendered concern about Hendrickson's ability to determine its ownership rights in the DataMaster system which was developed by McMasters, in part, with Cimulus source code for which Hendrickson held exclusive rights.  As explained by McMasters, the original Cimulus program was limited in its capabilities.  It only collected information about truck axles produced at the Lebanon plant.  As the Lebanon plant grew and began manufacturing other truck components, Hendrickson's  L-O-T traceability needs also grew. DM Dep., p. 56.  McMasters was tasked with the development of L-O-T traceability software that had greater versatility and could collect all of Hendrickson's production data. DM Dep., p. 59. Over time, McMasters did just that, designing a two-program system, one which runs on a server and the other which runs on a computer, which together collect L-O-T traceability data for all of the products manufactured at the Lebanon plant. DM Dep., p. 42.  Among other functions, Hendrickson's system transmits production data in real time to Hendrickson's headquarters in Woodridge, Illinois.

McMasters took the Cimulus source code CD and utilized it along with some software from a development kit and code that he himself wrote to create an enhanced system, which he called "DataMaster," which he individualized to meet the L-O-T traceability needs of Hendrickson and of other M & M clients such as Canton Wood Products, a barrel manufacturer also located in Lebanon. DM Dep., 47.  Through various iterations, by 2008, the L-O-T traceability system in place at Hendrickson differed substantially from the original Cimulus software and provided substantially more advanced functionality to Hendrickson.

McMasters acknowledged that the DataMaster product included some code from the old

Hendrickson Cimulus system, but consisted of code primarily written by McMasters. McMasters testified that M & M owned the DataMaster program in use at Canton Wood Products.

McMasters had a number of conversations with his supervisor, Neil Szczepanski,[5] concerning Molly McMasters' proposed the license agreement and Hendrickson's concerns over ownership of the DataMaster system and code. McMasters confirmed to Szczepanski that, in part, Molly was concerned that she was using pieces of the DataMaster system in her own business. DM Depo., p. 132. Neither M & M nor the McMasters had any licensing agreement with either Hendrickson or Cimulus. DM Dep., p.51. Upon advice of counsel, Hendrickson never executed the license agreement.

Thereafter, McMasters took approved FMLA leave from November 14, 2013 through January 1, 2014. He returned to work on January 2, 2014. Upon his return, he reported to the same supervisor, held the same position at the same rate of pay with the same job duties as he had prior to this FMLA leave.

On the day he returned from leave, Szczepanski requested that McMasters return the original Cimulus source code CD to Hendrickson. McMasters stated that he had seen it "recently," and repeatedly stated that he would return it to Hendrickson. DM Dep., p. 146. Six days later on January 8, 2014, when McMasters had still not returned the CD, he was formally requested to do so no later than 3:00 p.m. on January 13, 2014. McMasters did not return the CD. DM Dep., pp. 55, 131. On January 13, 2014, McMasters was discharged from Hendrickson for insubordination for failing to return the Cimulus CD as instructed. Szczepanski Dep., p. 63.

---

[5] At that time, Szczepanski was the Hendrickson Truck Commercial Vehicle Systems' Division Information Technology Manager, and was based in Woodridge, Illinois.

<u>Summary Judgment Standard</u>

Before granting a motion for summary judgment, the Court must find that there is no genuine issue of material fact such that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the initial burden of establishing the nonexistence of any issue of material fact, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986), a burden which may only be satisfied by "citing to particular parts of materials in the record..." or "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1). If the moving party satisfies this burden, the burden of production shifts to the non-moving party, who must then identify evidence demonstrating the existence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 322.

In resolving a motion for summary judgment, the Court must view the evidence in a light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). However, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Thus, "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). If the non-moving party fails to satisfy its burden of counterproduction, the court must grant the motion for summary judgment.

<u>Hendrickson's Motion for Summary Judgment on McMasters' First Amended Complaint</u>

(1) Summary Judgment – Retaliatory Discharge

*Allegations contained in the First Amended Complaint*

The first allegation in the First Amended Complaint ("FAC") is that Hendrickson terminated

McMasters in retaliation for exercising of his rights under the FMLA by taking leave.  DN 35, ¶ 34.
McMasters alleges the following sequence of events leading up to his termination:

(1) McMasters was on FMLA-protected medical leave from October 9, 2013 through October 14, 2013.  He returned to work without incident. FAC, ¶ 17.

(2) McMasters was on FMLA-protected medical leave from November 14, 2013 through January 1, 2014.  McMasters returned to work on January 2, 2014.  FAC, ¶¶ 19, 20.

(3) On January 2, 2014, Szczepanski asked McMasters to return the Cimulus CD to Henderson. FAC, ¶ 25.

(4) On January 8, 2014, Szczepanski informed McMasters that he must return the Cimulus CD to Hendrickson's Lebanon Plant manager by 3:00 p.m. on January 13, 2014. FAC, ¶ 29.

(5) McMasters failed to return the CD and was terminated on January 13, 2014 for failing to return the disk as instructed. FAC, ¶ 31.

In section of the First Amended Complaint entitled "FACTS," McMasters offers the
conclusion that "This reason for McMasters' termination [failure to return the CD] is pretext for
retaliation for having taken an FMLA-protected medical leave."  FAC, ¶ 32.  No facts are alleged in
support of this conclusory statement.

### Prima Facie Case

Where there is no direct evidence of retaliation, the *McDonnell Douglas*[6]  burden shifting
scheme applies.  *Brown v. Humana Ins.Co.,* 942 F.Supp.2d 723, 734 (W.D.Ky. 2013), *citing Donald
v. Sybra, Inc.*, 667 F.3d 757, 762 (6th Cir. 2012).  McMasters must first make out a *prima facie* case

---

[6] *McDonnell Douglas Corp.  v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

of retaliation. If he does so, Hendrickson must articulate a legitimate, nondiscriminatory reason for the alleged retaliatory act. If Hendrickson gives such a reason, McMasters must show that Hendrickson's reason is pretextual. *Id.*

In order to establish a *prima facie* case of retaliation for the exercise of FMLA rights, McMasters must show (1) that he availed himself of a protected right under the FMLA; (2) that he suffered an adverse employment action; and (3) that there was a causal connection between the exercise of the FMLA-protected right and the adverse employment action. *Edgar v. JAC Products, Inc.*, 443 F.3d 501, 508 (6th Cir. 2006), *citing Skrjanc v. Great Lakes Power Serv. Co.,* 272 F.3d 309, 313-16 (6th Cir. 2001)(applying *McDonnell Douglas* burden-shifting analysis in FMLA retaliation action).

As explained in *Edgar,*

> "The FMLA entitles qualifying employees to up to twelve weeks of unpaid leave each year if, among other things, an employee has a 'serious health condition that makes the employee unable to perform the functions of the position of such employee.' " *Walton v. Ford Motor Co.,* 424 F.3d 481, 485 (6th Cir. 2005)(quoting 29 U.S.C. § 2612(a)(1)(D))… Qualifying employees who return to work within that 12-week period are entitled to be reinstated to their previous position, or "to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." 29 U.S.C. § 2614(a)(1)…Section 105 of the FMLA, codified at 29 U.S.C. § 2615, prohibits covered employers from interfering with, restraining, or denying the exercise of their employees' rights under the statute, and also makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(1), (a)(2), and (b)...Two distinct theories of recovery arise under these statutes. *See Arban v. West Pub. Co.,* 345 F.3d 390, 400-401 (6th Cir.2003) (explaining the entitlement and retaliation theories of recovery under the FMLA); *see also Throneberry v. McGehee Desha County Hosp.,* 403 F.3d 972, 977-78 (8th Cir.2005) (same)…Under the retaliation theory (also known as the discrimination theory)…the employer's motive *is* an integral part of the analysis. *See Hodgens,* 144 F.3d at 160 (explaining that in retaliation cases, "the employer's motive is relevant, and the issue is whether the employer took the adverse action because of a prohibited reason or for a legitimate nondiscriminatory reason"). The employer's motive is relevant because retaliation claims impose liability on employers that act against employees specifically *because* those employees

9

invoked their FMLA rights. *See Kauffman v. Fed. Express Corp.,* 426 F.3d 880, 885 (7th Cir.2005) (observing that the retaliation theory applies where a company seeks to punish an employee "for exercising rights or opposing an unlawful procedure").

443 F.3d at 507-08.

There is no dispute that McMasters availed himself of a protected right under the FMLA during his employment at Hendrickson. McMasters took FMLA-approved leave in 2009, returning to work thereafter. DM Dep., pp. 63-66. There is no evidence that McMasters suffered any retaliation from this exercise of his FMLA rights. Significantly, the 2009 leave is not even mentioned in the FAC, however, McMasters was asked about this leave in his deposition. McMasters took two FMLA-approved leaves of absence near the end of 2013. He returned from the first of these two leave periods without incident, and so alleges in the FAC. He suffered an adverse employment action when he was terminated from employment on January 13, 2014, eleven days after returning to work from the November 2013 leave. Hendrickson notes that the ground stated for his discharge was insubordination for failing to return the Cimulus CD as instructed. However, McMasters attempts unsuccessfully to causally connect the most November FMLA leave with his discharge, and thus fails to state a prima facie case of FMLA discrimination.

In order to demonstrate a causal connection, McMasters must "proffer evidence sufficient to raise the inference that [his] protected activity was the likely reason for the adverse action." *Dixon v. Gonzales,* 481 F.3d 324, 333 (6th Cir. 2007)(*quoting EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997) and *Zanders v. National R.R. Passenger Corp.*, 898 F.2d 1127, 1135 (6th Cir. 1990)). McMasters' own allegations establish that upon his return from leave, he was asked to return the Cimulus CD to Henderson. McMasters does not deny that this disk was Henderson's property. Six days later when he still had not returned the disk, he was formally instructed to do so

by 3:00 p.m. on January 13, 2014.  McMasters admits that he did not return the disk by the designated deadline, and that he was terminated for that reason.

Temporal proximity alone between McMasters' return from the last FMLA leave and his termination is insufficient to establish a prima facie case of retaliation for two reasons: (1) The yardstick for retaliation for the exercise of FMLA rights is the time between Hendrickson learning of McMasters' exercise of FMLA rights and the purported retaliatory act in response.  Hendrickson knew since 2009 of McMasters' exercise of FMLA rights.  He took FMLA leave in 2009 and again in 2013.  The purported act of retaliation did not occur until after a third such leave was sought and taken in 2013 and he again returned to work.  While a later act *may* be retaliatory, in such an instance, additional evidence of retaliatory conduct must be adduced in order to establish a prima facie case; and (2) McMasters has admitted that all of the events leading up to his discharge did, in fact, occur, and events began to unfold before he took FMLA leave in November 2013.  There is a wealth of testimonial and documentary evidence in the record.  However, none of it supports a claim of FMLA retaliation.

Two prior FMLA-approved leaves were taken without incident, the first occurring four years prior to McMasters' termination.   There must be "an adverse employment action [which] occurs very close in time after an employer learns of a protected activity."  *Basch v. Knoll, Inc.,* 619 Fed.Appx. 4577, 459-60 (6th Cir. July 21, 2015) (*quoting Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008).  In *Basch,* the court found that the employer learned of the protected activity at the time of the first FMLA leave, and thus Basch's discharge 2 ½ years later after the most recent of repeatedly-approved FMLA leaves could not establish a prima facie case of causality in the absence of other evidence of retaliatory conduct.  (*See also, Mickey v. Zeidler Tool & Die Co., supra.* in which the court reasoned that "if an employer immediately retaliates against an

employee *upon learning of his protected activity*, the employee would be unable to couple temporal proximity with any such other evidence of retaliation because the two actions happened consecutively, and little other than the protected activity could motivate the retaliation." 516 F.3d at 525. (emphasis added)).

McMasters returned from the November leave and was terminated from employment eleven days later. The Sixth Circuit requires sufficient temporal proximity between the time the employer learns of the protected activity and the alleged retaliatory act to warrant an inference of a causal connection. As in *Basch*, Hendrickson *learned of* McMasters' exercise of his FMLA rights when he requested and took approved leave in 2009. He returned from the 2009 leave and the October 2013 leave without incident. It was not until January 2014 when he returned to work and was subsequently terminated that he alleged he was retaliated against for taking FMLA leave. In such a circumstance, temporal proximity as between the most recent leave and a subsequent adverse employment action may, when coupled with other evidence of retaliatory conduct, establish causality. But, standing alone, temporal proximity is not enough to establish a prima facie case. *Id.* at 460.

McMasters alleges in the FAC that while he was on leave in December, Hendrickson hired a new employee in the IT department who performed his duties, and that upon returning to work in January, this individual continued to work for Hendrickson, also reporting to Szczepanski. FAC, p. 3, ¶¶ 22-24. He alleges that this employee, Steve Weber, was hired to replace him. McMasters acknowledges, however, that he himself had requested, and, indeed, needed additional IT staff to help him at the Lebanon plant. He sent an email to his superiors while on leave in October requesting additional staff. DM Dep., pp. 174-75. He reiterated the need for additional IT staff prior to taking leave in November, and recommended his son-in-law, Paul Perkins, as a candidate. DN

Dep., 159-60.  While Hendrickson disputes the details concerning the new hire,[7] this factual dispute is ultimately unimportant, as the allegation, taken as alleged by  McMasters in the FAC, does not support  McMasters' claim that he was discharged because he took FMLA leave.  The hiring of an additional employee while McMasters was out on leave and his sharing in the work upon McMasters' return from leave does not suggest retaliation.  The persuasiveness, if any, of such an argument is undercut by McMasters' admission that he requested additional staff himself.

McMasters notes that he received the Cimulus disk in 2002 and, by 2014, was unable to locate it.  He urges that the disk was of no practical use to Hendrickson, however, as the L-O-T traceability system had been significantly modified by 2014  Thus he contends that Hendrickson's insistence on its return was unreasonable.  However, McMasters *does not* contend that Hendrickson's insistence upon the return of the CD was improper.  He concedes that the Cimulus disk was Hendrickson's property. This fact stands unrefuted.  McMasters' explanation as to how he came into possession and use of the disk and his contention as to its present lack of value do not provide the additional evidence he needs to establish a prima facie case that he was terminated ***because*** *he took FMLA leave*.

Thus, McMasters' claim of retaliatory discharge is premised solely upon the fact that he was terminated eleven days after returning from FMLA leave.  For this reason, we conclude that he has failed to make out a prima facie case of retaliation. *See, ie., Nguyen v. City of Cleveland*, 229 F.3d 559, 566 (6th Cir. 2000)(holding "the fact of temporal proximity alone was not particularly compelling, because the plaintiff's retaliation claim was otherwise weak, and there was substantial evidence supporting the defendant's version of the events…[W]hile there may be circumstances

---

[7] Sczepanski testified that Steve Weber was hired as an independent contractor while McMasters was on leave.  He testified that various Hendrickson employees and Weber all participated in covering McMasters' job duties while he was on leave.  McMasters was disconcerted that he was not consulted prior to hiring Weber and that Weber reported to Sczepanski rather than him.

where evidence of temporal proximity alone would be sufficient to support that inference, we do not

hesitate to say that they have not been presented in this case.").


*Legitimate, Non-Discriminatory Reason for Discharge and Pretext*

Assuming, *arguendo*, that McMasters made a prima facie showing of retaliatory discharge, the

burden then shifts to the defendant to come forward with sufficient evidence for a reasonable jury to

find a legitimate, non-discriminatory reason for the termination.  Hendrickson has clearly made this

showing.  *Brown*, 942 F.Supp.2d at 736.  Hendrickson's evidence offered to satisfy this burden

stands  virtually  unrefuted.   McMasters  does  not  dispute  the  sequence  of  events.   Rather,  he

essentially takes issue with Hendrickson's conclusions and its management decisions, urging that he

was  misunderstood  and  treated  unfairly.   However,  upon  a  showing  of  a  legitimate,  non-

discriminatory  reason  for  the  discharge,  McMasters  must  then  do  more  than  illustrate  a

disagreement or dissatisfaction with the decision.  Rather, he must establish that the stated reason

was a mere pretext for discrimination; that is, that it is more likely that he was discharged because

he exercised his right to take FMLA leave.  Further, "[S]o long as the employer honestly believed in

the proffered reason given for its employment action, the employee cannot establish pretext even if

the employer's reason is ultimately found to be mistaken, foolish, trivial, or baseless."  *Smith v.*

*Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1998).  The court in *Donald,* 667 F.3d at 763 elaborated

on the honest belief rule:

> We have adopted the honest belief rule, reasoning that it is not in the interests of
> justice for us to wade into an employer's decisionmaking process.  *Michael v.*
> *Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 598-99 (6th Cir. 2007).  It is instead
> the employer's belief, and whether it is informed and nondiscriminatory, with
> which we are concerned.  We do not require that the employer arrived at its
> decision in an "optimal" matter, *id*. at 599, but that it "reasonably relied on the
> particularized facts that were before it at the time the decision was made."

*Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001)(internal quotation marks omitted).

Hendrickson has come forward with evidence that it had an independent security audit performed in the third or fourth quarter of 2013 by Halock Security Labs.  Halock identified "some auditing gaps" (Szczepanski Dep., p. 52) that Hendrickson needed to remediate.  It followed Halock's recommendations concerning IT policies which should be implemented.  Halock also drafted written IT polices for Hendrickson as part of the audit.  Among the recommendations was a change in the management and control of Hendrickson's source code, and requiring all code to reside and be maintained solely on Hendrickson's servers and PCs.  Szczepanski stated that the reason it became important for Hendrickson to have the original source code disk in 2014 was because it was Hendrickson's property and, per the new policies adopted by Hendrickson, the code needed to be maintained on site at Hendrickson. (Szczepanski Dep., p. 97).

In October of 2013, Hendrickson notified McMasters of the new policies requiring that programming work be done at Hendrickson on Hendrickson PCs and servers, and that all of Hendrickson's source code be maintained on Hendrickson's premises.  After McMasters' receipt and acknowledgement of these policies and the expectations going forward, Molly McMasters sent Hendrickson a license agreement which immediately raised concerns at Hendrickson as to the ownership of code and the programs which were on Hendrickson servers.  This occurred prior to McMasters' November FMLA leave.

Hendrickson had a number of conversations with Szczepanski specifically concerning who owned the DataMaster system.  McMasters attempted to convey to Hendrickson that the license agreement prepared and presented by Molly McMasters did not have anything to do with the ownership of the L-O-T traceability system at Hendrickson as Hendrickson already owned the code

15

on their servers, per an agreement he reached with Rob Grooms.  DM Dep., pp. 124-25.  Rob Grooms was the Lebanon Plant accountant from May 2003 until May 2007.  Grooms was also responsible for the plant's information technology systems despite the fact that he was not an information technology professional. Grooms Affidavit, DN 58, p. 1.  Grooms stated that he regularly retained M & M Programming to do computer system work for Hendrickson.  He further stated, in pertinent part,

> I know that Mr. McMasters did not always bill Hendrickson for all the work he performed.  Although I do not recall the specific conversation regarding the development of the L-O-T traceability program, it was not uncommon for us to agree that M & M Programming could use the code Mr. McMasters developed for use in Hendrickson's Lebanon plant for other non-Hendrickson business applications.  These types of arrangements permitted us to obtain the work needed for our systems while also keeping Hendrickson's costs down.

Grooms Aff., DN 58, p. 2.

These arrangements for McMasters' work and agreements to allow M & M to utilize Hendrickson's code for its own business purposes were made[8] while McMasters was working for Hendrickson as an outside consultant with M & M.  Whatever the arrangement may have been while McMasters was a consultant with respect to M & M's use of Hendrickson's code on non-Hendrickson projects, it was clearly believed in 2013 that the method of operation presented a serious problem with regard to conflict of interest and proof of ownership or license rights in Hendrickson's programs and source code.  Szczepanski took his concerns to his boss, Dave Madonia, Hendrickson's Director of Finance, and Rick Johnson, Vice President of Information Technology.  Szczepanski Aff., ¶ 8.  Hendrickson received clarification from Cimulus concerning

---

[8] Hendrickson questions the truth of this explanation, as nothing was mentioned nor was there documentation of this arrangement with Grooms.  In viewing the evidence in the light most favorable to McMasters, the non-moving party, we will assume herein that there was some agreement with Grooms when McMasters was consulting with Hendrickson, but that Hendrickson did not know these details after McMasters became an employee of Hendrickson. We need not address the validity of any such arrangement for purposes of this opinion.

Hendrickson's rights in the source code, and, additionally, consulted patent attorneys Dureska, Kennedy & Moore, LLC for advice in the matter.  Counsel advised the Hendrickson management team not to sign the proposed license agreement from Molly McMasters, that the source coding performed by McMasters as a Hendrickson employee was likely protected under the Corporate Business Conduct or Ethics policies, and that to avoid potential legal liability, Hendrickson needed to obtain the original Cimulus source code CD from McMasters. Szczepanski Aff., ¶ 8.

Hendrickson's concern about its identification of and control over its source code was apparently a legitimate one, as McMasters stated that in developing the system for Hendrickson, he modified and enhanced the Cimulus source code utilizing a development kit and code that he wrote himself to meet the L-O-T traceability needs of Hendrickson and other M & M clients such as Canton Wood Products.   It was Hendrickson's position, as confirmed by Cimulus, Inc., that the original source code on the disk could not be used for other than Hendrickson projects per the license agreement, and that any developed or enhanced versions derived from that source code should be maintained, with the original source code, on the Hendrickson servers and PCs.  When McMasters did not return the Cimulus CD by the date and time requested, Hendrickson terminated McMasters for insubordination.

We conclude based upon the evidence adduced by Hendrickson that it has sufficiently identified a legitimate, non-discriminatory reason for McMasters' discharge.

Upon a sufficient showing by the employer of a legitimate, non-discriminatory reason for discharge, the burden once again returns to the plaintiff to show that the proffered reason for the discharge was a pretext for discrimination.  We further conclude that McMasters has failed to establish that this reason was a mere pretext for discrimination.

At paragraphs 31 and 32 of the FAC, McMasters states:

17

31. Hendrickson terminated McMasters' employment on January 13, 2014 for failing to return the disk as instructed.

32. This reason for McMasters' termination is pretext for retaliation for having taken an FMLA-protected medical leave.

Although McMasters asserts that the ground of insubordination was a pretext for retaliation, this statement is a bare legal conclusion. There must be facts undergirding the contention that McMasters' discharge was pretextual.

McMasters urges an inherent unfairness in Hendrickson's demand that he return the Cimulus CD which he received many years before while working off-site for Hendrickson as a consultant. He also takes issue with the fact that Hendrickson had concerns about the ownership of the L-O-T traceability code and systems, and its interpretation of Molly McMasters' proposed license agreement as evidence of a claim of ownership to source code in the possession of Hendrickson. However certain McMasters may be that Hendrickson was either misinformed or misunderstood the ownership and licensing issues, Hendrickson was left feeling uncertain and infirm in its ownership rights. While McMasters insisted that the license agreement was intended to put any concerns to rest about the ownership of source code, the agreement had anything but that effect on Hendrickson, and Hendrickson wanted the original source code CD back. McMasters was given the opportunity to return it, and when he did not, he was discharged.

The timeline of events beginning with the security audit in the third or fourth quarter of 2013 and ending with McMasters' discharge for insubordination eleven days after his returned from the November FMLA leave establishes that matters had come to light before the November leave which have not been shown to bear any relationship to the taking of that leave. Temporal proximity alone cannot be the sole basis for finding pretext. *Donald*, 667 F.3d at 673, *citing Skrjanc v. Great Lakes Power Serv. Co.,* 272 F.3d 309, 317 (6th Cir. 2001). There is a complete absence of any other

evidence to suggest pretext.  McMasters has not argued that Hendrickson did not have an honest belief in the reason for his termination.  Rather, he simply urges that Hendrickson was misguided and that McMasters' termination was based upon incorrect or misinterpreted information.  As established in *Smith, supra*., mistake or lack of factual foundation is not a basis for a finding of pretext.

We conclude that no genuine issue of material fact exists which would preclude the court from granting summary judgment in favor of Hendrickson on the claim for retaliatory discharge. We will grant Hendrickson's motion for summary judgment on this claim.

### (2) Summary Judgment – Retaliatory Counterclaim

McMasters also urges that after he filed his complaint against Hendrickson, Hendrickson filed a retaliatory counterclaim against him and against his wife, positing claims which are not meritorious.   FAC, ¶¶ 33, 34.   In the Sixth Circuit in cases at the district court level, discriminatory retaliation has been recognized to extend beyond the ultimate employment decision, to encompass  bad faith counterclaims such as alleged by McMasters.  *See Gill v. Rinker Materials Corp.*, No. 3:02-CV-13, 2003 WL 749911 (D.D.Tenn. Feb. 24, 2003)(retaliatory counterclaim recognized in  Title VII action); *Carr v. TransCanada USA Services, Inc.,* No. 3:14-cv-01084, 2014 WL 6977651 (M.D.Tenn. Dec. 8, 2014)(retaliatory counterclaim recognized in ADEA context, but stating "While it is true that in *some* circumstances counterclaims brought by employers after a former employee files charges of discrimination are retaliatory, it does not follow that *all* counterclaims of that natures must be retaliatory."); *Ambs v. Sir Home Improvement*, No. 1:11-cv-332, 2012 WL 1909355 (W.D.Mich. May 25, 2012)(retaliatory counterclaim theory recognized, through analogy to Title VII, ADA and ADEA cases, in FMLA

case).

Hendrickson seeks summary judgment on the FMLA "retaliatory counterclaim" claim in the FAC on the ground that it is entitled to *Noerr-Pennington* immunity which has been found to protect the First Amendment right of citizens to petition the government for redress of grievances. Although initially limited to antitrust litigation, it has now been found to apply to litigation in all contexts. *Warner v. Sim s Metal Management Ltd.,* No. C13-02190-WHA, 2013 WL 5754403 (N.D.Cal. October 21, 2013); *Rosania v. Taco Bell of America, Inc.*, 303 F.Supp.2d 878 (N.D.Ohio 2004)(FMLA retaliatory counterclaim asserted; "[probable cause to institute civil proceedings requires no more than 'a reasonable belief' that there is a chance that [a] claim may be held valid upon adjudication." *Prof'l Real Estate Invest., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 62-63, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993)). Additionally, Hendrickson urges that the undisputed facts preclude McMasters from establishing a prima facie case on this claim.

At this juncture, a recitation of additional facts is in order.

McMasters was discharged from employment for insubordination on January 13, 2014 at approximately 1:50 p.m. in the conference room of the Lebanon plant by Human Resources Manager Marlin Smith and Szczepanski. DM Dep., p. 172. He was asked for his phone and American Express card, and was escorted to his office to collect his personal belongings and then was escorted from the building. DM Dep., p. 173.

Smith was notified the next day that some of the operating and reporting systems at the Lebanon plant (the "Post Prod Service") stopped running and transmitting information to the home office at approximately the time McMasters was terminated and leaving the premises. Marlin Smith Affidavit ("Smith Aff."), ¶ 8. McMasters' administrative access to the Hendrickson systems was not terminated until at least 2:15 p.m. on January 13, 2014.

On January 15, 2014, Vestige, Ltd. was retained to conduct a computer forensic evaluation to establish a timeline of events surrounding the January 13, 2014 2:01 p.m. stoppage of the Post Prod service.[9] Vestige was also asked to compile a list of Apple devices connected to Daryl McMasters' computer. Vestige determined the following sequence of events occurred on January 13, 2014:

| | |
|---|---|
| 2:00:26 PM | "daryl-s-ipad" connects via remote desktop using the Administrator account to the KY Reports Server. |
| 2:01:14 PM | the Post Prod Service stopped running |
| 2:01:15 PM | a user identified as "dcmcmasters" logged on and off of the KY Reports Server |
| 2:01:19 PM | "daryl-s-ipad" device disconnected from the remote desktop session |
| 2:01:30 PM | "daryl-s-ipad" device reconnected to the KY Reports Server using remote desktop |
| 2:01:35 PM | the Microsoft Management Console Application® process was exited. |
| 2:01:37 PM | the "daryl-s-ipad" device disconnected from the KY Reports Server. |

Vestige Report, DN 55-11.  Paul E. Webel, Jr., Manager of E-Discovery and Forensic Services for Vestige, averred by Affidavit that this timeline of events was provided to Hendrickson prior to April 29, 2014.[10]

McMasters has acknowledged that he used his personal iPad from time to time at

---

[9] McMasters notes that glitching in the system occurred from time to time.  He has not shown that there was any problem with the Post Prod Service at or near in time to the January 13, 2014 2:01 p.m. event, however.

[10] It is unclear why the date of April 29, 2014 is significant.  The Complaint in this case was filed by McMasters on April 22, 2014.  The fact that this information was provided by Vestige to Hendrickson as early as April 29th evidences that this forensic evaluation was in the hands of Hendrickson before it filed its counterclaims.

Hendrickson.  DM Dep., p. 177.  He sometimes used iTap Mobile from his iPad which allowed him to externally communicate with the systems at Hendrickson. *Id.* at 178.  He possibly logged into the KY-Reports server using his iPad on January 13, 2014, but he unequivocally denies having caused the Post Prod Service to have gone down on the afternoon of January 13, 2014.  *Id.*, at 178, 181-82.  He denies having a device named "daryl-s-ipad."  He stated that he had only one iPad during his employment with Hendrickson and it was named "Daryl's iPad." DM Dep., p. 28.

The court need not venture into the land of disputed facts with regard to the alleged sabotage of Hendrickson's systems, which includes questions such as to whether a device name can be changed on an iPad, whether apostrophes are invalid characters which appear as hyphens, and whether there was enough time after clearing out his office for McMasters to have accessed the system.   Based upon the timeline evidence developed from Vestige's investigation immediately after the incident, Hendrickson undoubtedly held a reasonable belief that McMasters was responsible for the shutdown of the system.  It chose not to pursue the matter, however, until it was sued by McMasters for FMLA retaliation in April 2014, at which time it filed counterclaims against the McMasters.

In determining to file counterclaims,  Hendrickson chose to assert a claim for violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq*. ("CFAA"). In light of the event and the remarkable "coincidence" in the timing of McMasters' termination and the stoppage of the Post Prod Service, Hendrickson had a computer forensic evaluation performed in an attempt to discover the source of the interruption in the service.

The CFAA prohibits, in part, intentional access to a protected computer without authorization (18 U.S.C. § 1030(a)(5)(A)-(C) and knowingly causing a transmission which intentionally causes damage without authorization to a protected computer (18 U.S.C. §

1030(a)(5)(A). Damage includes the impairment or availability of data, 18 U.S.C. § 1030(e)(8). Assuming that a loss of $5,000 need be shown, Hendrickson's "loss" may include "costs incurred as part of the response to a CFAA violation, including the investigation of an offense." *Yoder & Frey Auctioneers, Inc. v. Equipmentfacts, LLC,* 774 F.3d 1065, 1074 (6th Cir. 2014).

Hendrickson also asserted breach of fiduciary duty and breach of the duty of loyalty by McMasters. While McMasters urges that, as an employee-at-will, he had no fiduciary duty and owed no duty of loyalty to Hendrickson, citing *Aero Drapery of Kentucky, Inc., v. Engdahl,* 507 S.W.2d 166, 168 (Ky.App. 1974), he was the sole IT specialist on-site at the Lebanon plant, with total responsibility for all computer system functions. Hendrickson could reasonably claim that there was a unique relationship of trust and confidence reposed between these parties.

While there are genuine issues of material fact underlying these claims, the court concludes that Hendrickson exceeds the Supreme Court's threshold for sham claims in bringing these claims against McMasters; that is, that Hendrickson has shown a reasonable belief that there was a chance that these claims would be held valid upon adjudication. *Prof'l Real Estate*, 508 U.S. at 62-63. "Certainty" and "likelihood" are not operational terms here. Rather, as noted by the Supreme Court, "[e]ven when the law or the facts appear questionable or unfavorable at the outset, a party may have an entirely reasonable ground for bringing suit." *Id.* at 61, n. 5. We find such reasonable ground to exist here.

Further, the court notes McMasters is hard pressed to find facts to substantiate *any connection* to his assertion of rights under the FMLA. As previously noted, the mere filing of a counterclaim by an employer in an FMLA suit brought against it by a former employee does not *ipso facto* establish a viable claim for retaliation. We find here that there was an independent basis for Hendrickson to file claims against McMasters for what it believed was disloyalty and

sabotage of their computer systems.  These matters were developed by Hendrickson's in-house security audit and externally by a post-incident forensic investigation.  Critically, all of this information was amassed prior to the filing of the FMLA suit by McMasters.  As found earlier with respect to the claim of retaliatory discharge, McMasters has offered nothing beyond weak evidence of temporal proximity to support a claim for violation of the FMLA.

Therefore, for the reasons set forth above, the court concludes that McMasters' claim for FMLA retaliation based upon the filing of a counterclaim by Hendrickson is without merit.

<u>The McMasters's Motion for Summary Judgment on Hendrickson's Counterclaim</u>

The McMasters have filed a motion for summary judgment as to all of the counterclaims asserted against them.  We have already found that genuine issues of material fact exist with respect to Counts I (Violations of the Computer Fraud and Abuse Act), V (Breach of the Duty of Loyalty), and VI (Breach of Fiduciary Duties).

Summary judgment will be granted in favor of McMasters on Hendrickson's claim for violation the Federal Stored Wire and Electronic Communications and Transactional Records Access Act, 18 U.S.C. §§ 2701(a)(1)-(2).  Hendrickson has provided precious little in the way of defense of this claim.  It cites generally to the Congressional intent to respond to the "mounting threat of computer hackers 'deliberately gaining access to and sometimes tampering with electronic communications.'"  DN 61, p. 25.  However, as noted by McMasters, "Courts have interpreted the statute to apply primarily to telephone companies, internet or e-mail service providers, and bulletin board services." *Becker v. Toca*, 2008 U.S. LEXIS 89123 at *9 (E.D.La. Sept. 24, 2008).  To survive summary judgment, Hendrickson must state more than that no court has yet precluded the claim that they assert under these facts.  The court rejects the attempt to

force-fit the alleged facts (deletion of a password) into the language of this statute (accessed a wire or electronic communication while such was in electronic storage). Count II of Hendrickson's counterclaim will be dismissed.

Counts III and IV allege violation of criminal statutes relating to "unlawful access to a computer." In defense of these claims, Hendrickson states that the statute "arguably affords civil relief," citing *Budsgunshop.com v. Security Safe Outlet, Inc.*, 2012 U.S. Dist. LEXIS 72575, **75-76 (E.D.ky. 2012). The statutes requires that the proscribed conduct be "for the purpose of...[o]btaining money, property, or services for themselves or another by means of false or fraudulent pretenses, representations, or promises." There are no allegations of fraud here. Rather, Hendrickson argues that any "secret arrangement" for M & M's use of the Cimulus code for non-Hendrickson purposes was without the effective consent of the owner. The fact that Hendrickson apparently failed to mind the store over a number of years and *did not know* how business was being conducted with its consultant-turned-employee does not state a genuine issue of material fact which will preclude summary judgment as to Counts III and IV.

Count VII claiming trespass to chattels will be dismissed as barred by the five-year statute of limitations. *See Ingram Trucking, Inc. v. Allen*, 372 S.W.3d 870, 872 (Ky.App. 2012). Hendrickson argues that sabotage of the Post Prod Service which "dispossessed" Hendrickson of the use of its data for a period of time states a claim for trespass to chattels. We find this argument to be without merit. As noted by McMasters, the data was never out of the possession of Hendrickson. It simply was not transmitted to the corporate office for a number of hours. The focus of the principle of trespass to chattels is possession. *See, Ingram Trucking Inc. v. Allen*, 372 S.W.3d 870 (Ky.App. 2012). Additionally, while there is no caselaw on the point in Kentucky, at least one jurisdiction has determined that data is not a chattel. *Fidlar Technologies v. LPS Real*

25

*Estate Data Solutions, Inc.*, 82 F.Supp3d 844 (C.D.Ill. 2015).  Hendrickson has cited no authority to the contrary.  Count VII will be dismissed.

Count VIII alleges violation of the Federal Wiretap Act based upon Hendrickson's allegation that the week after his termination, McMasters accessed a conference call with his access code because, according to Szczepanski, there was "heavy breathing" on the conference call line.  He contends that  McMasters was known to breathe heavily on conference calls, and that various call participants joked about "Darth Vader."  Szczepanski stated that he ended the conference call prematurely and had the access code changed because of the incident.   The best Hendrickson has in this regard is a suspicion.  Szczepanski Dep., pp. 153-155. This suspicion would not permit a reasonable jury to determine that it was more likely than not that McMasters accessed the conference call.  Summary judgment will be granted in favor of McMasters on Count VIII.

Count IX purports to allege a civil conspiracy between Daryl and Molly McMasters "to commit unlawful acts by unlawful means including, without limitation, unlawfully obtaining, using, and transferring property belonging to Hendrickson, and licensed and/or issued to Hendrickson, and to attempt to extort compensation and monies from Hendrickson in concert with one another and/or M & M."  Hendrickson's Counterclaims, ¶ 98.

Hendrickson has not come forward with evidence to establish a conspiracy between Molly and Daryl McMasters.  Molly denied knowing that her husband used or borrowed source code from another entity in developing and selling the L-O-T traceability systems.  Molly McMasters Dep., pp. 36-37.  Hendrickson has come forward with no evidence to the contrary.  Further, the license agreement drafted by her sought no money.  Hendrickson has failed to produce sufficient evidence to withstand summary judgment on this claim.  Count IX will be dismissed.

<u>Conclusion</u>

In conclusion, the court finds that there are no genuine issues of material fact with respect to many of the claims which would preclude summary judgment.   The First Amended Complaint will be dismissed in its entirety, and all but Counts I, IV, and V of the Counterclaims will be dismissed.

A separate order will be entered herein this date in accordance with this opinion.


**IT IS SO ORDERED.**


September 29, 2016

**Charles R. Simpson III, Senior Judge**
**United States District Court**